Anderson v. Dorsch, No. S1390-02 CnC  (Katz, J., Apr. 22, 2004)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT
Chittenden County, ss.:

ANDERSON

v.

DORSCH

ENTRY
(Motions for Partial Summary Judgment and to Amend Pleadings)

Following a stipulated divorce agreement, plaintiff Anderson brings an amended 135 paragraph, 27 page complaint against his attorney Dorsch for attorney malpractice.  Dorsch has filed for partial summary judgment on those claims arising from a stock fund transfer stipulated between Anderson and his wife.  Anderson opposes summary judgment for any of the claims and has produced an expert opinion for support.

Despite the apparent contention between the parties, the material facts of this case are not in question.  Plaintiff and his wife entered divorce

negotiations following a period of separation.  (Def. Mot. for Summ. J., at 1, Jun. 27, 2003.)  This led the parties and their attorneys to negotiate a stipulated agreement about the marital assets, which both husband and wife signed on August 22, 2000.  (Pl. Am. Compl., at ¶¶ 14, 15, Sept. 8, 2003.)  In particular, paragraph 2 of the agreement stated that Mrs. Anderson was to receive the fixed amount of $475,000 from a Fidelity stock account.  (Def. Mot. for Summ. J., Ex. B, at ¶ 2, Jun. 27, 2003.)  This withdrawal required the parties to select which stocks would be transferred.  Id.  While the agreement suggests that the Andersons would make this decision together with a Fidelity representative, id., Mrs. Anderson sought independent advice and generated her own list that, as of August 31, 2000, satisfied the amount.  (Def. Mot. for Summ. J., Ex. E, at 3, Jun. 27, 2003.)  Mrs. Anderson then sent the list to her attorney who mailed it to Dorsch on Tuesday, September 8th.  Id. at 2.  This list reached Dorsch's office on Friday, September 11th.  (Pl. Resp. to Def. Stmnt. of Undisp. Facts, ¶ 6, Jul. 28, 2003.)  Dorsch had previously told Anderson that he would be out of state on vacation for the first two weeks of September.  (Def. Mot. for Summ. J., at 2, Jun. 27, 2003.)   When Dorsch returned to his office on Monday, September 14th, he faxed the list of stocks to Anderson who made the transfer the next day, September 15th.  (Def. Mot. for Summ. J., Ex. G, Jun. 27, 2003.)  Anderson acknowledged the transfer in a letter to Pricilla Dubé, his ex-wife's attorney.  Id.  The letter did not acknowledge that by this time, the value of the stocks had dropped and the transfer was $53,000 short of the agreed upon sum.  (Def. Mot. for Summ. J., Exs. H, I, Jun. 27, 2003.)  Anderson was ordered to pay the wife that remaining sum by the Family Court and incurred further attorney fees and court costs.  (Def. Mot. for Summ. J., Ex. I, Jun. 27, 2003.)

Notwithstanding Anderson's amended complaint, which nominally focuses on negligence and breach of contract, the claims against Dorsch for

the stock transaction divide neatly into two factual areas—formation of the settlement agreement and its execution. These discrete areas divide plaintiff's claims against Dorsch for the stock transfer into two different areas of liability. Plaintiff's formation claims may be summarized as "what Dorsch should have done" while the execution claims are "what Dorsch did not do." The difference is that the formation liability depends on Dorsch having and failing in a duty to prepare and advise the plaintiff. 3 R. Mallen & J. Smith, Legal Malpractice § 27.8 (5th ed. 2000) (detailing recurring errors in family law for property division). Execution liability depends on Dorsch's diligence in fulfilling his duties enumerated in the settlement or inherent in the scope of his representation. Id. at § 19.3 (diligence).

## Settlement Formation

During formation, plaintiff argues, he relied on Dorsch's knowledge and skill as a divorce attorney to negotiate and draft an agreement that would protect his assets. Reliance on an attorney, however, is grounded in what the attorney was expected to do and how he performed and not what the client expected as an outcome. See Hulstrand, Anderson, Larson & Boyland v. Rogers, 386 N.W.2d 302, 304 (Minn. App. 1986) ("The mere fact that appellant lost his case does not establish negligence."). Attorneys, like Dorsch, perform many services for clients during their representation including: researching and advising regarding the law, filing appropriate papers, preparing a strategy, negotiating, drafting documents, examining witnesses, pursuing pre-trial discovery, and arguing before the judge. See e.g. Ziegelheim v. Apollo, 607 A.2d 1298, 1303 (N.J. 1992) (setting out various duties owed by attorneys to clients). Here, the usual claims of attorney negligence are absent. All the assets were known, and the papers were timely filed. Cf. Sutton v. Mytich, 555 N.E.2d 93, 95 (Ill. App. 1990) (charging that plaintiff's attorney failed to discover all of spouse's assets

prior to the stipulation).   Instead, the focus is on the deal finally negotiated with the adverse spouse and her attorney.

Specifically, the deal which was negotiated, committed to paper, and executed was one which, in retrospect, worked to the husband's disadvantage.  In the face of a bear market, he absorbed the risk that the stocks' value would decline, because the agreement, as it was structured, permitted the parties to engage in consultation before transferring, which in theory and practice took some time.  Yet regardless of this time, the wife was guaranteed a set value.  When the market declined, the husband was left with something less than what he expected—something less than half.

This unfortunate outcome was not the result of law overlooked, not the result of deadlines missed, and not the result of assets not found.  It was, instead, the result of a declining market and the negotiated agreement, which put the risk of such a decline onto the husband.  Surely, the attorney was not responsible for predicting either the course of the market or the possibility that it might decline.  See, e.g., In re U.S. Airways Group, Inc.., 303 B.R. 784, 795–96 (Bkrtcy. E.D. Va. 2003) ("The stock market, however, is highly volatile and far from certain . . . .  While it is easy to run computer simulations, the simple fact is that no one can predict with certainty what returns the stock market will produce over the next 50 years.").  The fact that risk of such a decline inhered in husband, by the terms of the agreement, is one which was obvious from the document.  It was not a legal issue understood only after the translation of arcane terms.  Berman v. Rubin, 227 S.E.2d 802, 807 (Ga. App. 1976) (no liability where the terms of the agreement were unambiguous and free of "legal jargon").  That risk, of course, also meant that the wife might take her agreed value and then leave the husband with a greater amount should the market have gone the other way.

It is not the fault of Attorney Dorsch that the wife did not agree to different terms. "To be sure, lawyers generally cannot be held liable for their failure to persuade opposing parties to agree to terms." Zigelheim, 607 A.2d at 1306. The terms were not inherently unfair. They merely saved the wife from risk by putting that risk instead upon the husband. He accepted those terms, which, in the end, was a business judgment not a legal one. This is, for example, wholly different from the advice in Zigelheim that "wives generally get no more than twenty percent of the marital estate." That was legal advice. Here, even the absence of advice by Dorsch was no more than business advice, but it would have been a retelling of the obvious—the clear meaning of plain words. Berman, 227 S.E.2d at 807.

Unlike the settlement in Zigelheim, plaintiff's divorce settlement was not a bad deal. Cf. Zigelheim, 607 A.2d at 1300–01 (plaintiff on the advice and misestimation of her attorney settled for only 14% of the marital assets). It is transparently the result of a negotiation process which placed some premium on a level of security for the wife. Hence, she was guaranteed the $475,000 while plaintiff was not. The ramifications of this arrangement are not some recondite legal construct. One need not juggle the Rule in Shelley's Case against the Internal Revenue Code to comprehend it. We have in mind that plaintiff was not only an attorney, but he apparently participated in first earning the not insubstantial capital and then choosing the investments. Whether and to what extent a client will be charged with knowledge of the contents of a settlement provision, its accuracy, and omissions will depend on the particular circumstances. 3 Mallen, § 27.8. To the extent a certain level of understanding and intelligence can be presumed in a party, we will. The difference between a triable issue of understanding and the failure of a client to fully appreciate

the inherent risks of a settlement is made in <u>Lowry v. Lowry</u>, 393 S.E.2d 141, 145–46 (N.C.App. 1990).  In <u>Lowry</u>, a North Carolina Court of Appeals granted summary judgment when:

> The plaintiff was given ample opportunity to read and evaluate the Separation Agreement she signed. She is an educated woman and at one time was a licensed realtor. We find it important to note that the error she alleges required no legal explanation and could easily have been discovered by adding four numbers contained in the Appendix to the Separation Agreement (80,402.00 sub total + $40,000 Promissory Note + 179,148.00 Cash + 225,000 Pension and profit sharing plans = $524,550).

<u>Id</u>. at 145.  The court distinguished this kind of understanding from another case where a genuine issue existed when the client was unaware of the legal consequence of language removed from a consent judgment.  <u>Id</u>. (discussing <u>Cheek v. Poole</u>, 390 S.E.2d 455 (N.C. App.1990).

> Here the dispute is not over the language in the contract and its legal effect. It is over a simple mathematical addition. Her attorney owed her a duty to review and explain to her the legal import and consequences which would result from her executing the Separation Agreement. However, this duty does not relieve her from her own duty to ascertain for herself the contents of the contract she was signing.

<u>Lowry</u>, 393 S.E.2d at 145–46.

The circumstances in this case, particularly when measured against the alleged fault of the attorney, cause us to conclude that no issues of disputed facts are necessary to proper resolution of this case.  The asserted inadequacies of the negotiated settlement agreement are such that they were not legal so much as negotiated; its full comprehension is not so much legal

as quotidian common sense. Plaintiff's circumstances as a successful attorney would preclude a jury finding of legal malpractice causing harm. Berman, 227 S.E.2d at 807 (affirming summary judgment against client, a well education person, who had not only read the agreement but had participated in its drafting).

The other argument inherent in plaintiff's claim against Dorsch in the settlement formation is for his advice or lack thereof. We begin with the principle that in any negligence action, the plaintiff is obliged to take reasonable precautions for his own safety. See, e.g., Shea v. Peter Glenn Shops, 132 Vt. 317, 319 (1974) (noting that against defendant's liability plaintiff's conduct and concern for his own safety must be balanced). Negligent advice in negotiating and advising Anderson to sign the divorce agreement is therefore premised in part on the need for advice. Liability for advice is not for errors in judgment but a failure to exercise ordinary skill and knowledge in giving advice. 3 Mallen, § 23.5, at 511. This duty does not include a duty to inform the client of "all possible alternatives no matter how remote or tenuous." First Interstate Bank of Arizona, N.A. v. Murphy, 210 F.3d 983, 986 (9th Cir. 2000). It depends on the nature of the undertaking and the foreseeability of the results. See, e.g., Hangman Ridge Training Stable, Inc. v. Safeco Title Ins. Co., 652 P.2d 962, 965 (Wash. 1982). The proper advice depends on the extent of the risk and the needs and sophistication of the client. Conklin v. Hannoch Wiseman, 678 A.2d 1060, 1069 (N.J. 1996).

In this case, plaintiff is a sophisticated business actor who had substantial knowledge of the stock market and the risks involved with stock transfers. He is also a lawyer who was aware that the execution of any transaction involves time and process. Indeed, his anxiety over the stock selection and its execution proves his contemporaneous understanding of the risk he has assumed by the settlement structure. It is unclear what, if any, additional advice Dorsch could have offered plaintiff. More importantly, plaintiff makes no showing that owing solely to better advice from Dorsch, he would have gotten a better deal. Plaintiff husband's awareness that he needed to conclude the transfer quickly was not lacking. Nor was the wife's position unexplored. She wanted 1) no risk and 2) time to make an independent selection. Plaintiff's argument pushes this determination into the realm of "what if" speculation, but it does not

change the information that was on the table at the settlement or the plaintiff's awareness of what he was signing. While we need not go as far, other jurisdictions have refused to re-examine negotiations for public policy reasons. Muhammad v. Strassburger, McKenna, Messer, Shilobod and Gutnick, 587 A.2d 1346, 1348–49 (Pa. 1991) (holding that public policy encouraging settlements barred, short of fraud, a dissatisfied client from recovering for a settlement that the client approved). Here, plaintiff was aware of the nature of the settlement and the mechanics involved. He has not shown that with different advice from Dorsch he would have received a better settlement.

## Settlement Execution

The remaining issue for summary judgment is Anderson's claim that Dorsch was negligent during the execution of the stipulation. While expert witness testimony is sometimes helpful in determining the standard of care in a professional malpractice case, Tetreault v. Greenwood, 165 Vt. 577, 578 (1996) (mem.), it is not necessary where the facts of the professional's actions and the standard of care are apparent. See Estate of Fleming v. Nichlson, 168 Vt. 495, 497–98 (1998) (noting that expert witnesses are not necessary where the professional's lack of care is clear). While expert witnesses are helpful and sometimes necessary, the standard of professional care is ultimately the province of the court to determine. Fleming, 168 Vt. at 499; see also Brown v. Kelly, 140 Vt. 336, 338 (1981) (stating that the trial court "concluded" negligence but "found" no damages because the negligence was not the actual cause). In the present case, the stipulation as it was drafted, gave the attorneys no further role in the stock transfer. The pertinent language states, "The parties shall work with the Fidelity account representative to divide the Fidelity account . . . . Both parties shall sign any documentation necessary to complete these distributions and [Anderson] shall be responsible for preparing and providing to [Mrs. Anderson] any documentation necessary for her to execute . . . ." (Def. Mot. for Summ. J., Ex. B, at ¶ 2, Jun. 27, 2003.)

The uncontested evidence concerning the parties' understanding at the time of the stipulation supports this interpretation. The parties at the time of the stipulation agreed that Anderson would be handling the stock transfer. He was in contact with his ex-wife and her attorney. Both Mrs.

Anderson and her attorney knew from the stipulation and discussion that Anderson, alone, would be doing the transfer. Anderson, on the other hand, knew that Dorsch was going to be out of his office for two weeks. As Anderson was handling the transfer, there was no reason for Dorsch to conclude or anticipate that the other parties would send the stock list to him and not to Anderson. During the first two weeks of September, Anderson was not prevented from calling either Mrs. Anderson or her attorney to follow up on the stock list. Instead, he chose not to act. When Dorsch did receive the list, he passed it along immediately.

Liability for omissions or inaction in such situations, will often stem from an attorney's failure to perform a necessary task in a timely manner. See, e.g., Kessler v. Loftus, 994 F. Supp. 240, 241 (D.Vt. 1997) (attorney delay in recording divorce agreement left client as an unsecured creditor); Perry v. Ossick, 467 S.E.2d 604, 606 (Ga. 1996) (attorney failed to better secure note from divorce agreement). In the present case, Dorsch had no task or role in the transfer. The stipulation clearly limited responsibility to the parties themselves. When Anderson and his expert witness discuss this issue, they are really talking about the earlier issue of advice that might have required Dorsch to demand a provision requiring under penalties that Mrs. Anderson to make and deliver her stock list within a set time. That is not the agreement that parties drafted here and that was not the role Dorsch was assigned.

Any role Dorsch could have played was negated when Anderson accepted the list and made the transfer. By not informing Dorsch that the stock prices had dropped or that Anderson was only going to transfer the stocks listed, which would be $53,000 short of the agreed sum, Anderson ended any possibility for Dorsch to negotiate with Mrs. Anderson and her attorney. As to the risk of fluctuating stock prices, it was inherent in the stipulation. Dorsch did nothing to further Anderson's risk in that respect. Therefore any duty that would charge Dorsch with monitoring the compilation and communication of the list would be a retroactive imposition and outside the facts of the stipulation and the understanding of the parties. We are not prepared to assign such a duty.

The only remaining issue to discuss is Anderson's motion to amend his pleadings. Pleadings may be amended by motion after the time for

responsive pleadings by leave of the court or the written consent of the adverse party. V.R.C.P. 15(a). While Dorsch has not exactly opposed this motion to amend, he has not explicitly consented to it either. We will, however, grant this motion because of the liberal standard of Rule 15, which permits motions to amend for the purpose of allowing parties to move to trial on the merits rather than to defend a faulty pleading. 6 C. Wright et al., <u>Federal Practice & Procedure</u> § 1471, at 505–06 (1990). This amended complaint must, however, reflect the foregoing discussion of the stock transfer, which eliminates counts five and six and count seven to the extent that it touches upon the stock transfer.

Based on the foregoing, defendant's motion for partial summary judgment is granted, and plaintiff's claims concerning the stock transfer are dismissed. Plaintiff's motion to amend his remaining complaint is granted.

Dated at Burlington, Vermont_____, 2004.


_____
Judge